## F. J. Fitzwilliam v. J. S. Travis.

1. CORPORATIONS—*Liability of the Promoters Before the Organization is Complete.*—When one is induced to subscribe for stock in a corporation which fails to complete its organization, he may recover the money paid by him for such stock from the promoters of the corporation, or from any of them to whom he pays his money.

2. SAME—*Persons Receiving Money Must Have Authority.*—In order to hold the promoters of an abortive corporation, it must be shown that

the person receiving the money sought to be recovered was authorized to receive it for the corporation, and that he in fact did so receive it.

**Assumpsit,** for money had and received. Appeal from the Circuit Court of McLean County; the Hon. ALFRED SAMPLE, Judge, presiding. Heard in this court at the November term, 1895. Reversed and remanded. Opinion filed May 16, 1896.

WELTY & STERLING, attorneys for appellant.

The stock was never paid for, and even if it had been paid for, unless the money had been paid to Fitzwilliam, or for his use, he would not be liable. 1 Thompson's Com. on Law of Corp., Sec. 449; Burnside v. Dayrell, 3 Exch. 224; 6 English Railway Cases, 52; 92 L. J. (Exch.) 46.

Neither the secretary nor the treasurer of the company had authority to sell the stock in question and collect for the same. 4 Thompson's Com. on Law of Corp., Secs. 4697, 4715, 4716; Loan Ass'n v. Ruhl, 55 Ill. App. 65.

The treasurer of the said corporation was not *prima facie* the proper person to collect, but to preserve and dispose of, under the orders of his superiors, the funds after they are collected. 4 Thompson's Com. on Law of Corp., Sec. 4715.

A. E. DEMANGE, attorney for appellee, contended that the rule is established in England that a plaintiff, having paid his money for shares in a concern which never came into existence, or a scheme which was abandoned before it was carried into execution, has paid it on a consideration which has failed, and may recover it back as money had and received to his use, unless he can be shown to have consented to or acquiesced in the application of the money which the directors have made. Bradford v. City of Chicago, 25 Ill. 423.

In Walstab v. Spotteswood, 15 Meeson & Welsby, p. 515, a case where the stock of a corporation had been sold and then the corporation abandoned, it was held that the action for money had and received would lie against a member of the managing committee, to recover back the money paid, although the money was not, in fact, paid to such member. Under this authority, the common law action for money

had and received is joint and several against those actively participating in the concern, whose action induced the payment of the money, as in this case. Walstab v. Spotteswood, 25 M. & W. 515; Nockells v. Crosby et al., 3d B. & C. 814; Kempson v. Sanders, 13 Eng. C. L. 321; Thomp. Off. Corp. 148; Ashpitl v. Sercombe, 5 Exch. 174; 6 Ry. & Canal Cas. 224; Ward v. Lord Londesborough, 12 C. B. 254; Vollans v. Fletcher, 1 Exch. 20; Chaplin v. Clark, 4 Exch. 402.

The directors' minute book is proper evidence against defendant. Ashpitl v. Sercombe, 5 Exch. 174.

It is directly contrary to all the testimony in this record to assume that Schureman was unwarranted in selling the five shares of stock to appellee; but assume for a moment that he acted without authority, yet the defendant would still be liable under the familiar rule of law and equity, that he who places it in the power of another to defraud a third must bear the loss resulting from such fraud. Yeck v. Crumm, 122 Ill. 267; Marshall v. Ender, 20 Ill. App. 312; Calhoun v. Lipp, 20 Ill. App. 414.

MR. JUSTICE WALL DELIVERED THE OPINION OF THE COURT.

The appellee brought an action of assumpsit against appellant and W. H. Schureman to recover money alleged to have been paid to them as officers of a corporation which was never organized. Service was had on appellant only. He pleaded to the declaration and upon trial by jury the issues were found for plaintiff and the damages assessed at $530. From the judgment rendered upon that verdict a new trial having been denied this appeal is prosecuted. It appears from the evidence that appellant and Schureman and three other persons agreed to form a corporation for the purpose of building electric light plants, water works and other such improvements in cities. The capital stock was fixed at $50,000 of which appellant and Schureman subscribed $15,000 each, and the residue was subscribed by the other three.

A certificate of incorporation was issued by the secretary of state; the subscribers held a stockholders' meeting,

adopted by-laws, elected themselves directors, and by the directors the appellant was elected president and Schureman was elected secretary. No money was paid on the subscription of stock and the certificate of incorporation was not recorded. The stock was divided into five hundred shares of $100 each and the by-laws provided that one-half of the stock should be preferred and the holder thereof should be guaranteed a dividend of ten per cent per annum and no more. Such dividend and the operating expenses to be first paid. The other half of the stock was to receive no dividend until after the expenses and dividend on preferred stock had been paid. On the 2d of February, 1893, and while all the stock was still held by the original subscribers, as far as shown by the books, the directors held a meeting at which it was resolved that the preferred stock should be sold upon payments, to be made by installments of twenty-five per cent, each thirty days until fully paid, and that the corporate attorney be instructed to prepare " a proper contract of guaranty to be signed by the common stockholders to purchasers of preferred stock." At and before this Schureman was a banker doing business at Normal, some two miles from Bloomington, which was to be the place of the office of the corporation, and the books and seal of the corporation were kept by him at his bank.

Appellant, as president, signed some blank certificates of stock, common and preferred, so that they might be issued when the proper time came. This was done, as he says, to save the necessity of Schureman coming to Bloomington, to obtain his signature. It does not appear that any certificates of stock were filled out of an earlier date than February 2, 1893, or that all subscribed for were ever prepared or signed.

The company had some business in view and took some steps toward securing contracts in the line of its intended operations, but as already stated, no money was paid in on the stock.

On the 3d of February, 1893, the appellee, who had a sum on deposit with Schureman, called at the bank and

spoke of his desire to invest another sum of money in some good and safe way.

Schureman told him that the preferred stock of this company would be an excellent thing for him, that a dividend of ten per cent on it would be guaranteed by the common stockholders and advised him to take it.

Appellee said he would consider it, and returned on the 6th, and then said he would invest six hundred dollars in the stock, and laid down the money for it, to which Schureman replied that he could not give him the papers then, but would give him a certificate of deposit in his bank for the money, to which appellee assented, and a certificate of deposit was prepared and handed to him, and he was told to return on Wednesday, two days later, when the guaranty would be ready. Appellee returned on the day named. Schureman then handed him a certificate of six shares of stock, and he proffered the certificate of deposit, but Schureman said, "No you keep it until you get the contract," referring to the guaranty, which he said would be ready in about ten days. Some ten days later, the appellee went back and was put off with the excuse that the parties had not all signed, but the contract would be ready in another week or ten days. Appellee went back two or three times. Still all the parties had not signed, as Schureman told him. On the 6th of April he said to Schureman that he would perhaps need one hundred dollars of the money, and wished to know whether he could reduce his subscription to that extent. Schureman said it could be done, and paid him that amount, which was credited on the certificate of deposit and gave him a certificate for five shares of stock dated that day, in lieu of the former certificate which was then surrendered.

Appellee again inquired when the guaranty contract would be ready, and Schureman replied in a few days, when appellee said, "This is not business; you promised it, and I want you to take this certificate and get me the contract;" but Schureman again declined to take it, and put him off with the promise that he would get the guaranty in a short

time. Appellee went away retaining the certificate of deposit, and the certificate of stock, and did not again see Schureman, who suspended business, and made an assignment for the benefit of his creditors about five weeks later. It does not appear the appellant or any of the other stockholders knew anything about the transaction between appellee and Schureman, or that the latter made any attempt to obtain a contract of guaranty, or that a form for such a contract had been prepared as ordered at the meeting of February 2d.

The corporation did not proceed to the transaction of any business, and in August, 1893, formal surrender of the charter was made. Whatever indebtedness had been incurred and whatever contracts it had undertaken were assumed by individuals, some of them stockholders, and thus the corporation ceased to exist, if, indeed, it ever had any legal existence.

For the present purpose, we may assume the law to be in effect as stated by appellee, that when one is induced to subscribe for stock in a corporation which fails to complete its organization, he may recover the money paid in by him for such stock from the promoters of the corporation or from any of them to whom he pays his money for such purpose. The projectors of an abortive scheme ought to bear the burden so incurred, and when the money of a plaintiff has been so used, he would have a right to recover, or if it is paid to one or more who assume the right to furnish the stock, they at least would be responsible.

And so assuming, the question is whether the money paid by appellee to Schureman was also paid to appellant.

It was not paid to appellant alone, for he never saw it or knew anything of it; and he can not be made to answer for it, unless it was paid either to the corporation or to him and Schureman, through the latter acting for him.

Schureman was not, as shown by the record, authorized to receive any money for the corporation, and he seems to have been alive to that fact; but conceding that he was, by the action of the appellant and the other promoters, clothed

Fitzwilliam v. Travis.

with such apparent authority that they should not be permitted to repudiate his action, the definite and ultimate inquiry is, what really took place between him and appellee? Was there, as between them, a payment by the latter to him in a representative capacity for the corporation or the appellant, or was he merely holding, in his personal capacity as a banker, the money of appellee until the transaction could be completed and perfected by the delivery of the promised contract of guaranty? As we have seen, he had convinced the appellee that the investment was desirable, because a written guaranty of ten per cent dividends would be signed by the common stockholders, whose names were given and who were deemed responsible.

This was an important, and indeed indispensable, feature of the proposed transaction. We can not believe that appellee would have been willing to invest his money without it. It was a part of the understanding that he was to have it, and it seems clear beyond all doubt that neither of them supposed the transaction would be complete until it was furnished. Hence we find that all the while Schureman was unwilling to take up the certificate of deposit until that was done.

He knew that this was necessary, and we are satisfied that though appellee repeatedly asked for it, and was ready and anxious to give up his certificate of deposit, still he had no purpose to part with his money until he got it.

He had repeatedly extended the time within which it was to be furnished. Whenever Schureman was in default, it was open to appellee to withdraw from the negotiation for that reason, and it was only by his consent that the time was extended. The last extension was on the 6th of April, and then Schureman, in response to appellee's urgent complaint, said the guaranty would be ready in a few days. Appellee did not see him again, although the bank was open until May 15th. The guaranty was never prepared, and though a period, which could hardly be designated by the term "a few days," elapsed before the bank suspended, the appellee did not again call for it.

As the guaranty was never prepared, and as the time within which it was to be furnished had expired, Schureman could not complain of appellee. He could not ask him to perform their agreement, or to make amends for not doing so. Had appellee called on Schureman within a reasonable time after the last extension, he might have insisted upon performance, but he did not, and the natural conclusion is, that he had wearied of the matter, and had concluded to drop it. We find that though on all previous extensions he called promptly on time, in the last instance he suffered five weeks to pass without giving the subject any further attention.

Schureman had no right to do what he was proposing to do—that is to say, he was not authorized to receive money for the company.

He evidently knew that, for he made no effort to get the guaranty. Either this, or he was merely managing the affair so as to keep the money in his bank, which was then probably in a failing condition.

· If he obtained the guaranty he would have to account for the money to the company.

He kept the matter to himself, and no intimation of it was suffered to reach the other stockholders.

The appellee after so long delay should have suspected that there was something wrong. After a delay of two months, within which he had been repeatedly disappointed in getting the guaranty, which could have been obtained without delay, if at all, he permitted his money to remain in Schureman's hands upon another promise, to be performed within a few days, for more than a month longer, when the crash came. If he supposed Schureman was really the representative of others, he had no right to tolerate the unbusiness-like methods of which he complained so much and then hold those others responsible for the result. We can reach but one conclusion, which is that he must be regarded as a mere depositor.

This view of the matter is fatal to his claim as against the appellant.

It is unnecessary, therefore, to examine the various errors alleged as to the admission or rejection of evidence, or the giving or refusing of instructions.

Should the case be again tried, and the evidence appear in substance as now, it will be proper for the court to direct a verdict for defendant.

The judgment will be reversed and the cause remanded.